People v T.D. (2026 NY Slip Op 00993)

People v T.D.

2026 NY Slip Op 00993

Decided on February 19, 2026

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: February 19, 2026

Before: Kern, J.P., Friedman, Rodriguez, Pitt-Burke, Rosado, JJ. 

Ind No. 70910/22|Appeal No. 5368|Case No. 2023-06486|

[*1]The People of the State of New York, Respondent,
vT.D., Defendant-Appellant.

Twyla Carter, The Legal Aid Society, New York (Jonathan R. McCoy of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Faith DiTrolio of counsel), for respondent.

Judgment, Supreme Court, New York County (Laura A. Ward, J.), rendered October 30, 2023, convicting defendant, upon her plea of guilty, of arson in the second degree, and sentencing her to a term of eight years in prison, to be followed by five years of postrelease supervision, modified, as a matter of discretion in the interest of justice, to the extent of reducing the prison term to five years, and otherwise affirmed.
We do not find an abuse of discretion by the sentencing judge. However, we reduce defendant's sentence under our interest of justice powers, giving due consideration to the seriousness of defendant's offense, but finding that further incarceration would be unduly harsh in light of defendant's significant mental health issues and moderate intellectual disability.
Defendant T.D. was charged with arson in the second degree (Penal Law § 150.15) in connection with a March 13, 2022 incident in which she set fire to a mattress in her apartment and quickly left the building without alerting other residents. The resulting fire caused significant damage to defendant's apartment, as well as other apartments in the building.
After being indicted, and by order dated March 22, 2022, defendant was referred for a CPL article 730 examination and underwent two evaluations to determine if she was fit to proceed to trial. During her evaluations, defendant reported, inter alia, that she has "heard voices 'all her life'" and that the music artist Cardi B. implanted "a rat into her stomach," performed "voodoo" on her, messaged her through reality TV, and that her feud with "Cardi B was responsible for the instant offense." The forensic evaluators diagnosed defendant with "[u]nspecified schizophrenia spectrum and other psychotic disorder," and found her unfit to proceed pursuant to CPL article 730 because her "mental disease or defect prevent[ed] her from rationally appreciating the charges against her."
In light of defendant's CPL article 730 examination results, and by order dated May 13, 2022, Supreme Court adjudicated defendant incapacitated and ordered that she be committed to the custody of the Commissioner of the New York State Office of Mental Health (OMH). Approximately one year later, on or about April 24, 2023, OMH filed a notification of defendant's fitness to proceed based on evaluations conducted by two CPL article 730 forensic evaluators. The OMH report noted that defendant still had auditory hallucinations and continued delusions but found that they did not directly interfere with her ability to think clearly and rationally about her case and appreciate the possible courses of action in her defense. Specifically, the report found that defendant understood the charges against her and was capable of consulting with her counsel with "a reasonable degree of rational understanding."
Thereafter, in May 2023, a mental health counselor from CASES recommended defendant be placed in an alternative to incarceration residential community to continue outpatient psychiatric care. That same month, two forensic psychiatric evaluators issued a report detailing defendant's personal history and diagnosing her with "schizoaffective disorder, posttraumatic stress disorder, and a moderate intellectual disability." The forensic psychiatric report found that defendant still suffered from delusions, was "in need of significant, ongoing mental health treatment," and recommended that she be placed in a residential community-based mental health treatment program due to the severity of her psychological issues.
At defendant's October 2, 2023 plea proceeding, defense counsel submitted the above-mentioned CASES letter and the psychological evaluations. Counsel noted that the parties met in chambers prior to the plea proceeding to discuss defendant's mental health history and that the People recommended a 10-year sentence and proposed an alternative disposition; a not-guilty-by-reason-of insanity (NGRI) plea. Counsel then sought a five-year sentence for defendant, as she did not want to pursue the NGRI disposition.
After considering defendant's mental health and criminal history, Supreme Court indicated it was willing to impose an eight-year sentence, despite the People's objection. Defendant accepted the court's proposed disposition and pleaded guilty to arson in the second degree (Penal Law § 150.15), in exchange for a promised prison sentence of eight years, followed by five years of postrelease supervision.[FN1]
During the plea proceeding, the court conducted a comprehensive colloquy in which defendant affirmed her understanding of her trial rights, executed a written waiver of her right to appeal, and admitted that on or about March 13, 2022, she intentionally damaged a building that was occupied by others by starting a fire inside of it.
Prior to sentencing, defendant was interviewed by the Department of Probation. During her presentence interview, she admitted guilt for the offense, stating:
"I set my bed on fire. I was listening to the voices that were in my head. I admit my guilt. There were no other occupants in my home. I feel terrible for what I did because other people could have been hurt or killed. I was high on weed at the time."
At sentencing, Supreme Court noted defendant's statement in the presentence report and its implication that a possible defense could have been raised. The court then asked defendant if she "underst[ood] that by pleading guilty, [she was] giv[ing] up the right to raise [that she was hearing voices] as a defense." Defendant responded in the affirmative but now contends her plea should be vacated because Supreme Court was required to inquire further into her defense to ensure that her plea was knowing and voluntary (see People v Lopez, 71 NY2d 662, 666 [1988]). Defendant concedes that her claim that the plea was involuntary was not preserved. However, she contends that her plea allocution falls within the narrow exception to the preservation requirement (id.).
This Court has "repeatedly held that the Lopez exception does not apply to statements in presentence reports" (People v Grant, 203 AD3d 477, 478 [1st Dept 2022], lv denied 38 NY3d 1033 [2022]; People v Vasquez, 227 AD3d 417, 417 [1st Dept 2024], lv denied 42 NY3d 930 [2024]; People v Rojas, 159 AD3d 468, 468 [1st Dept 2018], lv denied 31 NY3d 1086 [2018]). However, as the People concede, once a defendant's statement raising a possible defense is addressed at sentencing, "regardless of where and how it was originally expressed, it becomes a part of the actual sentencing proceeding," triggering a court's duty to inquire further (People v Dupree, 235 AD3d 120, 125 [1st Dept 2025] [internal quotation marks omitted]).
Contrary to our dissenting colleague's assertion, this case presents a rare instance where the narrow exception to the preservation requirement applies (see Lopez, 71 NY2d at 666). At sentencing, Supreme Court made a sua sponte on the record inquiry into the statements defendant made to the Department of Probation during her presentence interview. While the court further addressed defendant's statements, the sentence was imposed immediately after this exchange, rendering defendant with a "practical inability to move to withdraw" the plea (People v Conceicao, 26 NY3d 375, 382 [2015]; People v Rosa, 135 AD3d 434, 434-435 [1st Dept 2016], lv denied 27 NY3d 968 [2016]).
Although there is no "precise scope of [a] court's required inquiry," once alerted on the record to a statement by a defendant that casts doubt on their guilt or raises any defense, psychiatric or otherwise, the court must go beyond asking "general questions" to ensure the validity of the plea (Dupree, 235 AD3d at 126). Here, at sentencing, the court—confronted with defendant's statement to the Department of Probation raising a possible defense—inquired further to confirm that defendant understood that by pleading guilty, she was giving up her ability to raise a potentially viable insanity defense (see People v Mox, 20 NY3d 936, 938-939 [2012]; Lopez, 71 NY2d at 666; People v Serrano, 15 NY2d 304, 310 [1965]). While a more detailed factual inquiry could have been conducted, defendant's mental health was central to the plea negotiations and the presentence interview statements addressed by the court did not raise the possibility of this defense for the first time. Based on these circumstances, Supreme Court's inquiry was sufficient to ensure defendant's guilty plea was knowing and voluntary.
The dissent asserts that no purpose is served in holding that a court is obligated to conduct a further inquiry when, at sentencing, it addresses a defendant's statement in a presentence report that indicates a possible defense. While the dissent expresses the alleged disutility of our holding by contending that defendant's mental health condition and the substance of the statement in the presentence report had been well known and thoroughly explored throughout the pendency of this matter, "[t]he fact remains, . . . that, before accepting a plea of guilt where the defendant's story does not square with the crime to which [s]he is pleading, the court should take all precautions to assure that the defendant is aware of what [s]he is doing" (Serrano, 15 NY2d at 310). Once the court placed defendant's presentence interview statements on the record, ensuring that defendant adequately understood the possibility of an insanity defense was the reason a further inquiry was required.
Notwithstanding the above findings, this Court has the authority to reduce a sentence that is unduly harsh or severe as a matter of discretion in the interest of justice, even where the sentencing court did not abuse its discretion and in the absence of extraordinary circumstances (see People v Brisman, 43 NY3d 322, 324 [2025]; People v Delgado, 80 NY2d 780, 783 [1992]). Such exercise of interest of justice authority is warranted here, as defendant's eight-year sentence is unduly harsh when considering her mental health history and personal circumstances(see People v Farrar, 52 NY2d 302, 305-306 [1981]).
As noted above and acknowledged by the dissent, the record, which includes defendant's CPL article 730 examinations and forensic-psychiatric evaluations, unequivocally demonstrates the substantial mitigation present in this case, including defendant's documented history of severe mental illness, intellectual disability, and trauma since her childhood (see People v Sparks, 232 AD3d 168, 172 [1st Dept 2024]; People v Watt, 189 AD3d 637, 638, 640 [1st Dept 2020]; People v Reyes, 89 AD3d 401, 402-403 [1st Dept 2011]), auditory hallucinations, severe depression (see People v Jeffries, 160 AD2d 406, 406-407 [1st Dept 1990]), numerous psychiatric diagnoses (see Watt, 189 AD3d at 639; Reyes, 89 AD3d at 402), substance use (see People v Mitchell, 168 AD3d 531, 532 [1st Dept 2019]; People v Walsh, 101 AD3d 614, 614 [1st Dept 2012]), and frequent psychiatric hospitalizations. The record also clearly establishes that defendant's mental illness contributed to the commission of the offense and continues to present circumstances which render her continued eight-year incarceration pursuant to her plea agreement unduly harsh and severe.
Against this backdrop, defendant's criminal history does not preclude a determination that her sentence is unduly harsh (see Mitchell, 168 AD3d at 532; Walsh, 101 AD3d at 614), nor does the seriousness of her crime (see Watt, 189 AD3d at 638-639 [concurrent 14-year sentences reduced to 10 years for defendant diagnosed with multiple behavioral and cognitive disorders and convicted of attempted murder in the second degree and robbery in the first degree]; Reyes, 89 AD3d at 402-403 [11-year sentence reduced to 8 years for defendant, who had been diagnosed with schizophrenia and convicted of attempted murder in the second degree, based on mitigating factors]; see also People v Hamlett, 235 AD3d 432 [2025], lv denied 42 NY3d 1046 [2025]; People v Garcia, 177 AD3d 432 [1st Dept 2019], lv denied 34 NY3d 1128 [2020]; People v Pagan, 159 AD2d 6 [1st Dept 1990], lv denied 76 NY2d 895 [1990]).
Therefore, based on the totality of these circumstances, and in the interest of justice, we reduce defendant's eight-year sentence to five years (see Brisman, 43 NY3d at 324; People v Rosenthal, 305 AD2d 327, 329 [1st Dept 2003], citing Delgado, 80 NY2d at 783; CPL 470.15[6][b]).
All concur except Friedman, J. who concurs in part
and dissents in part in a memorandum as follows:

FRIEDMAN, J. (concurring in part and dissenting in part)

While I concur with the result reached by the majority insofar as it declines to vacate defendant's guilty plea, I disagree, for reasons more fully discussed below, with the majority's view that a statement made by the court itself at the sentencing hearing — upon a subject that had been thoroughly explored throughout the entire prosecution — triggered a duty on the part of the court "to inquire further to ensure that defendant's guilty plea is knowing and voluntary" (People v Lopez, 71 NY2d 662, 666 [1988]). I dissent from the majority's reduction of the eight-year sentence, which defendant, with the advice of counsel, had accepted as part of her plea agreement.
Defendant, who lived in an apartment building, set her mattress on fire and then left the building. The fire caused extensive direct damage to defendant's apartment and the one directly above it, caving in ceilings and walls. In addition, the building as a whole sustained heavy damage from water and smoke, and windows were broken throughout the building. The fire necessitated the evacuation of the entire building for several hours, on a day when there was snow on the ground. For this act, defendant was charged by a grand jury with second-degree arson (Penal Law § 150.15).
The record is replete with evidence of defendant's mental illness, which involved schizophrenia that caused her to hallucinate by hearing voices. Defendant was initially found unfit to stand trial but, about a year after her crime, she was found fit to stand trial after medication brought her symptoms under control. A psychiatric report in the record specifically notes that defendant had told her examiners that, on the day of the fire, "the voices" were "getting the best of [her]."
In plea negotiations, the People offered to accept a plea of not guilty by reason of insanity. Defense counsel discussed this option with defendant, but she declined to pursue it. Since defendant refused to plead not guilty by reason of insanity, the People offered a 10-year prison sentence. At the plea hearing, defense counsel requested the minimum five-year sentence. The court was unwilling to impose a minimum sentence in light of defendant's criminal history and the seriousness of her offense, but offered an eight-year sentence, two years less than the People's offer. Defendant accepted the court's offer and pleaded guilty to second-degree arson, admitting that she "intentionally damaged a building by starting a fire" while "there were other individuals in the building."
Four weeks after the plea hearing, defendant appeared for sentencing. Before sentence was pronounced, the following exchange between the court and defendant took place:
THE COURT: So with regard to the defense, I just have one question. In the [presentence report], Ms. [D], it says that you claim that, at the time of the incident, you were hearing voices. You understand that by pleading guilty, you give up the right to raise that as a defense; do you understand?
THE DEFENDANT: Mmm, hmm.
THE COURT: I will take that as a yes.
In the above colloquy, the court was apparently referring to the following statement attributed to defendant in the presentence report: "I set my bed on fire. I was listening to the voices that were in my head. I admit my guilt."
On appeal, defendant argues that, when the court referred at the sentencing hearing to her statement in the presentence report about "hearing voices" at the time she set the fire, the court triggered a duty under Lopez for the justice "to inquire further to ensure that defendant's guilty plea [was] knowing and voluntary" (Lopez, 71 NY2d at 666). Defendant contends that the one question the court asked at that juncture ("You understand that by pleading guilty, you give up the right to raise that as a defense; do you understand?") was insufficient to discharge its duty of inquiry. The majority agrees with defendant that the court's statement triggered a duty of inquiry under Lopez, but finds that, in light of the record as a whole, the inquiry the court actually made discharged that duty. In my view, no duty of inquiry arose.
The Lopez duty of inquiry typically arises from a statement made by the defendant at the plea or sentencing hearing that "clearly casts significant doubt upon the defendant's guilt or otherwise calls into question the voluntariness of the plea" (Lopez, 71 NY2d at 666; see id. at 664 ["During the plea allocution, . . . defendant made statements that raised the possibility of a justification defense and the possibility that he lacked the requisite criminal intent"]; see also People v Mox, 20 NY3d 936, 937-938 [2012]). Last year, this Court extended the Lopez rule by holding that a duty of inquiry may arise from "the prosecution's comments, made during a plea or sentencing proceeding in open court, that raise a possible defense to the charged offense" (People v Dupree, 235 AD3d 120, 121 [1st Dept 2025]). As the majority acknowledges, a duty to inquire never arises from a statement written in a presentence report that is not referred to in open court at the sentencing hearing (see People v Grant, 203 AD3d 477, 478 [1st Dept 2022], lv denied 38 NY3d 1033 [2022]).[FN2]
In the present case, the majority and defendant take the position that a duty of inquiry was triggered by a statement at the sentencing hearing that was not made either by defendant or by the prosecution. Rather, the statement in question was made by the court, sua sponte, based on a sentence in the presentence report that, by itself, could not have triggered any duty. No authority has been cited as support for the view that the court could impose a duty of inquiry upon itself — a duty that would not otherwise exist — simply by referring to a sentence in the presentence report. I do not see what purpose is served by holding that, by making such a statement, the court imposes upon itself a duty to make further inquiry. The disutility of such a rule is particularly evident in this case, where the substance of the statement in the presentence report — that defendant had been hearing "voices in [her] head" when she committed her crime — had been well known and thoroughly explored throughout the pendency of this matter, during which the disposition of the case was delayed for about a year until defendant's mental condition was stabilized by medical treatment, and the possibility of a plea of not guilty by reason of insanity had been raised by the prosecution and rejected by defendant. If the court's statement triggered a duty of inquiry, as the majority maintains, the minimal inquiry the court actually made can be regarded as sufficient only if this procedural history is borne in mind.
Turning to the issue of the sentence itself, I disagree with the majority's view that the eight-year sentence — the penalty offered by the court that defendant, advised by counsel, agreed to accept as part of her plea agreement — was so "unduly harsh" that a reduction to five years is warranted "in the interest of justice." There is no question that defendant suffers from mental illness, but, at the time of her plea, her medical treatment had rendered her fit to stand trial. The court's offer of eight years extended a significant measure of leniency to defendant, since the prosecution had offered 10 years. Had she gone to trial, she faced the possibility of a sentence of up to 25 years in prison (see Penal Law § 70.02[3][a]). The People had a very strong case against her — including surveillance video of her fleeing her apartment just before black smoke started pouring from under the door — and there is little doubt that she would have been convicted after a trial.
Moreover, defendant committed a most serious crime that placed numerous other people in danger. She set fire to her apartment in a six-story residential building, placing the entire building at risk and jeopardizing the lives and well-being of all of its residents, as well as responding firefighters. The fire caused severe damage throughout the building while ruining multiple apartments. Dozens of residents of the building, including elderly people and children, were displaced and had to wait in a bus for hours until accommodations could be found for them. Defendant realized the danger of what she did, since she fled the building immediately after starting the fire, without warning anyone else. Five minutes later, she called 911 to report the fire, claiming that it had been set by her "boyfriend." In fact, defendant later admitted that she had no boyfriend at the time. It is no thanks to defendant that, fortunately, no one suffered serious injury or death as a result of her criminal actions.
The eight-year sentence is also warranted by defendant's criminal history. She has two prior felony convictions, both for attempted third-degree criminal sale of a controlled substance. The mitigating factors cited by defendant — her mental illness, her traumatic life experiences, and her intellectual limitations — were known to the sentencing court, which, taking them into account, deemed eight years to be the appropriate sentence, rather than the 10 years sought by the People. Nor, considering the nature of the crime, is a reduction of the sentence consistent with a proper concern for public safety.
For all of the foregoing reasons, I would affirm the conviction in all respects, and respectfully dissent from the majority's reduction of the sentence.THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 19, 2026

Footnotes

Footnote 1: During the plea proceeding, counsel confirmed he did not have any trouble speaking with defendant and that defendant was competent to proceed with the plea. Defendant affirmed that she had received enough time to discuss the plea and sentence with her counsel and that her medications did not affect her ability to understand what was happening.

Footnote 2: Contrary to the majority's assertion, defendant's statement in the presentence report that she was hearing voices when she set the fire (which simply restated what she had been saying since her arrest) is not a "story [that] does not square with the crime to which [s]he [was] pleading" (People v Serrano, 15 NY2d 304, 310 [1965]). That her crime was related to her mental illness simply raised a possible affirmative defense that a jury might or might not have accepted. The connection of her crime to her mental illness was not inconsistent with her guilt, as her initial attempt to blame the crime on a nonexistent boyfriend (as more fully described in my discussion of the sentencing issue) tends to show that she was aware of the wrongfulness of her conduct.